**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

| | | |
|---|---|---|
| **SHANE LEE GLENN,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:14-25969** |
| | ) | |
| **CAROLYN. W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Orders entered October 1, 2014, and January 5, 2016 (Document Nos. 4 and 14.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 13.)

The Plaintiff, Shane Lee Glenn (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on May 3, 2011 and February 14, 2012, respectively, alleging disability as of May 10, 2006, due to back pain, degenerative disc disease, bulging discs, and pain in the legs and shoulders. (Tr. at 18, 74-80, 91-96, 98.) The claims were denied initially and upon reconsideration. (Tr. at 30-31, 56-58, 61-63, 69-71.) On June 11, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 55.) A hearing was held on October 30, 2013, before the Honorable Andrew Chwalibog. (Tr. at 376-95.)  By decision dated January 23, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 18-28.) The ALJ's decision became the final decision of the Commissioner on July 29, 2014, when the Appeals Council denied Claimant's

request for review. (Tr. at 5-8.) Claimant filed the present action seeking judicial review of the administrative decision on September 18, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2014). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2014). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings,

has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, May 10, 2006. (Tr. at 20, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "degenerative disc disease of the lumbar spine, COPD, and history of fracture to the left distal radius and ulnar styloid," which were severe impairments. (Tr. at 20, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 22, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity for medium work, as follows:

> [T]he [C]laimant has the residual functional capacity to perform less than a full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c). The [C]laimant can stand and walk about six hours and sit about six hours of an eight-hour day. The [C]laimant can only occasionally climb a ladder or scaffold. The [C]laimant can frequently climb a ramp or stair, balance, stoop, kneel, crouch, and crawl. The [C]laimant should avoid concentrated exposure to vibration, fumes, odors, dust, and pulmonary irritants. The [C]laimant can only occasionally perform gross manipulation with the non-dominant, left upper extremity.

(Tr. at 22-23, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 26, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ also concluded that Claimant could perform jobs such as a hospital cleaner and laundry worker, at the unskilled, medium level of exertion. (Tr. at 26-27, Finding No. 10.) On this basis, benefits was denied. (Tr. at 27, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on November 14, 1974, and was 38 years old at the time of the administrative hearing on October 30, 2013. (Tr. at 26, 380.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 26, 97, 99.) In the past, he worked as a construction laborer and security guard. (Tr. at 26, 99, 391.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence and will summarize it and discuss it below in relation to Claimant's arguments.

**Left Wrist**:

Claimant wrecked his motorcycle ("dirt bike") on May 1, 2006, and broke his left wrist. (Tr. at 150, 233.) The x-rays of his left wrist revealed an intra-articular fracture involving the distal left radius, an ulnar styloid fracture, and minimal radial displacement of the distal radial component. (Tr. at 151, 234.) He underwent closed reduction and screw fixation (Tr. at 152, 156, 235, 239.) Dr. Kenneth R. Hanington, M.D., noted that Claimant was "doing well" postoperatively. (Tr. at 156, 158,

239, 241.) On May 15, 2006, Dr. Hanington noted that Claimant presented with full digital motion and that he was intact neurovascularly. (Tr. at 158, 241.) Repeat x-rays on May 8, 2006, revealed a comminuted intra-articular fracture involving the distal left radius that was fixated with plate and screw fixation. (Tr. at 157, 240.) It was noted that the fracture fragments were in good apposition and that there was an ulnar styloid fracture present. (Id.) On May 26, 2006, Dr. Hanington noted that Claimant bruised the left wrist over the surgical site when he walked through the house without his splint and banged it on the counter. (Tr. at 159, 161, 242, 244.) He presented with some soreness and swelling, but nothing significant and an x-ray confirmed that his plate remained in place, with no change in position or alignment of his fracture fragments. (Tr. at 159-60, 242-43.) Claimant was advised to wear the splint full-time with the exception of grooming and gentle motion. (Tr. at 159, 242.) Despite the direction to wear his splint, Claimant reported on May 31, 2006, that he climbed a ladder over the weekend and caught himself with his left, broken wrist when a rung broke. (Tr. at 161, 244.) Claimant presented with an inability to straighten his thumb and Dr. Hanington confirmed that he ruptured a tendon. (Tr. at 161-63, 244-46.)

On June 1, 2006, Claimant underwent an extensor pollicis tendon repair with a transposition. (Tr. at 163, 246.) It was noted on June 9, 2006, that he was doing well and due to his history of noncompliance, Dr. Hanington placed him in a thumb spica cast. (Tr. at 163-64, 246-47.) On July 11, 2006, Dr. Hanington observed that Claimant had cut down his cast to a thumb gauntlet and removed the proximal portion of the cast with a steak knife. (Tr. at 164, 247.) Claimant however, did not rupture his repair and Dr. Hanington noted that his wound was well healed and intact. (Id.) In an effort to protect his wrist and thumb, Dr. Hanington had made a custom forearm based Orthoplast thumb spica. (Id.) Claimant returned to Dr. Hanington on August 8, 2006, without his splint in place. (Tr. at 165, 248.) The x-rays nevertheless showed good evidence of healing of the distal radius fracture, though the ulnar styloid avulsion fracture remained a fibrous union. (Tr. at 165-66, 248-49.)

On physical exam, Dr. Hanington observed that Claimant's thumb EPL repair was intact and functional, he had full distal flexion, was able to move his thumb to the head of his fifth finger, was able to fully extend the IP joint, and was intact neurovascularly. (Tr. at 165, 248.) He noted that Claimant was "doing relatively well in spite of himself." (Id.) Claimant was directed to continue to wear his splint for two weeks in public, but could remove it when sleeping or watching television. (Id.) Dr. Hanington noted that Claimant had "been incredibly noncompliant." (Id.)

By September 6, 2006, Claimant was doing very well and had excellent range of motion. (Tr. at 167, 250.) It was noted that thumb range of motion had excellent extension, he was non-tender, and neurovascularly he was intact. (Id.) Dr. Hanington noted that Claimant had no limitation. (Id.)

**Back**:

On October 19, 2010, Claimant fell backward when he was raking leaves and fell on tree roots, which resulted in pain in his low back and left flank area. (Tr. at 128-29.) He was diagnosed in the emergency department with contusion to the left flank and elbow and muscle spasm. (Tr. at 130.) The x-rays of Claimant's chest, thoracic spine, and lumbar spine were unremarkable. (Tr. at 131-33, 188-89, 216-18.) Claimant presented to Dr. Breton L. Morgan, M.D., on October 27, 2010, with complaints of excruciating pain in the low back down into his legs. (Tr. at 135, 207.) Claimant could barely move without significant pain in his low back and Dr. Morgan noted that his low back was exquisitely tender with marked spasms in the paravertebral muscles. (Id.) Dr. Morgan diagnosed acute thoracolumbar sprain strain and possible herniated disc, and prescribed a Medrol dose pack and Lortab. (Id.) It was noted that Claimant did not want an MRI due to lack of insurance. (Id.)

Claimant followed up with Dr. Morgan on November 24, 2010, for a recent flare up of back pain. (Tr. at 136, 206.) His pain mostly was confined to the low back and was not radiating. (Id.) Physical exam revealed tenderness of the low back and normal straight leg raising. (Id.) Dr. Morgan continued the diagnosis of thoracolumbar sprain, discontinued the steroids, continued the Lortab, and

added Naprosyn. (Id.) On December 22, 2010, Claimant reported that the Naprosyn did not help and that he was sleeping poorly. (Tr. at 137, 205.) It was noted that Claimant smoked one pack of cigarettes per day. (Id.) Physical exam remained unchanged and Dr. Morgan substituted Meloxicam for the Naprosyn, continued Lortab, and added Trazodone for fibromyalgia. (Id.) On January 26, 2011, Claimant reported that the Trazodone did not help the fibromyalgia and Dr. Morgan substituted Phrenlin. (Tr. at 138, 204.) On physical exam, Claimant's low back generally was tender and straight leg raise testing was abnormal. (Id.) On February 3, 2011, Claimant reported continued low back pain with pain radiating down the left leg. (Tr. at 139, 203.) His low back was tender on exam, and straight leg raise testing on the left leg was abnormal. (Id.) Dr. Morgan diagnosed symptomatic disc disease at L4-L5 and L5-S1 and recommended an MRI. (Id.) On March 22, 2011, Claimant agreed to have an MRI scan. (Tr. at 140, 202.) Physical exam revealed general tenderness to the low back and diminished straight leg raising testing on the left leg. (Id.)

An MRI of Claimant's lumbar spine on April 4, 2011, revealed disc bulging and degenerative change at L4-5 and L5-S1, causing acquired canal stenosis but no significant neural foraminal narrowing. (Tr. at 127, 186, 213, 284.) Claimant followed-up with Dr. Morgan on April 25, 2011, with complaints of continued low back and right leg pain. (Tr. at 141, 201, 274.) Straight leg raising was abnormal on the right and the rest of the exam was physiologic. (Id.) Dr. Morgan diagnosed spinal stenosis at L4-5 and L5-S1. (Id.) He advised Claimant to cease smoking. (Id.) On May 23, 2011, Claimant reported an episode of right neck pain and right upper extremity numbness. (Tr. at 200, 273.) Physical exam revealed tenderness to the low back, abnormal straight leg raising testing on the right, and an unremarkable neck. (Id.) Dr. Morgan diagnosed spinal stenosis and right sciatica, right worse than the left. (Id.) On June 20, 2011, Dr. Morgan noted that Claimant worked full time laying tile. (Tr. at 199, 272.) Physical exam revealed a flat low back and diminished bilateral straight leg raising. (Id.) He diagnosed spinal stenosis, right greater than the left and prescribed a Medrol

Dose Pack, Meloxicam, and Lortab. (Id.) Physical exam findings remained unchanged on July 25, 2011. (Tr. at 198, 271.)

On August 4, 2011, Dr. Rakesh Wahi, M.D., performed a consultative examination at the request of the State agency, for Claimant's bulging discs, degenerative discs, and left wrist problems. (Tr. at 142-46.) Claimant reported that he smoked two packs of cigarettes a day. (Tr. at 143.) Claimant's physical examination was unremarkable with normal ranges of motion, strength, and sensation. (Tr. at 144-45.) Claimant was able get off and on the exam table without difficulty, was able to squat, and was able to walk on his heels and toes. (Id.) Dr. Wahi's impressions included history of wrist injury and lumbar injury. (Tr. at 145.) The x-rays of the lumbar spine were negative. (Tr. at 148.)

Claimant returned to Dr. Morgan on August 22, 2011, and reported occasional episodes of neck pain with right upper extremity pain. (Tr. at 197, 270.) Physical findings revealed "okay" neck range of motion, some tenderness in the paraspinal region, marked pain on extension of the lumbar spine, "okay" flexion, and some tenderness to the right S1 region. (Id.) Dr. Morgan diagnosed spinal stenosis lumbar region by MRI and cervicalgia with occasional right upper extremity paresthesia. (Id.) On September 27, 2011, Claimant's low back remained tender and flat and straight leg raising testing was abnormal on the left. (Tr. at 196, 269.) On October 26, 2011, Dr. Morgan referred Claimant to Dr. Werthammer for neurological evaluation. (Tr. at 190, 195, 268.) On November 22 and December 20, 2011, Claimant continued to have a flat low back and diminished straight leg raising testing on the left. (Tr. at 193-94, 266-67.)

On January 5, 2012, Claimant was examined by Dr. Matthew C. Werthammer, M.D., for a neurological consultation on the referral of Dr. Morgan. (Tr. at 184-85, 208-09, 275-76.) Claimant reported intermittent low back pain, with rare pain that extended into the leg and rare left leg numbness. (Tr. at 184, 208, 275.) Physical exam revealed full cervical and lumbar range of motion

8

and an absence of paraspinal muscle spasm or point tenderness. (Id.) Neurological exam was intact, and straight leg raising testing was negative bilaterally. (Tr. at 184-85, 208-09, 275-76.) Dr. Werthammer noted that the lumbar spine MRI revealed only mild degenerative disease at L4-5 and L5-S1, but no evidence of large disc herniations or severe stenosis. (Tr. at 185, 209, 276.) His impressions included mild degenerative lumbar disease with chronic low back pain without significant radicular features and mild disc bulging "but nothing overly impressive to warrant consideration for surgical intervention." (Id.) Dr. Werthammer recommended conservative management through physical therapy and exercises for Claimant's low back. (Id.)

Claimant followed-up with Dr. Morgan on January 18, 2012, and continued to have a flat low back and abnormal left straight leg raising testing. (Tr. at 192, 265.) On February 15, 2012, Claimant continued to report low back pain with radiation down the left leg. (Tr. at 264.) Physical findings revealed kyphosis of the thoracic spine, diminished lungs, and abnormal left straight leg raising testing with pain instantly down the left leg. (Id.) Dr. Morgan diagnosed disc bulging at L4-5 and L5-S1, with spinal stenosis and COPD. (Id.) On March 14, 2012, physical findings and diagnoses remained unchanged. (Tr. at 263.) Dr. Morgan noted marked pain on extension of the lumbar spine on April 11, 2012, and tenderness and abnormal bilateral straight leg raising testing on May 10, 2012. (Tr. at 328-29.) He again noted abnormal bilateral straight leg raising on August 9 and September 11, 2012. (Tr. at 324-25.) Dr. Morgan's physical findings remained consistent through December 6, 2012. (Tr. at 321-23.) On December 6, 2012, Claimant reported right hand, index, and thumb numbness with loss of grip. (Tr. at 321.) On physical exam, Dr. Morgan noted that his right and left hand grips were "okay." (Id.) He referred Claimant to Dr. Cheshire. (Id.) On January 7, 2013, Dr. Morgan observed some right hand grip strength difficulty, but on February 5, 2013, Claimant's grip was "okay." (Tr. at 319-20.)

On February 26, 2013, Claimant was evaluated by Dr. Amanda Cheshire, M.D., upon the

referral of Dr. Morgan, for complaints of right hand numbness and weakness, as well as burning in the feet. (Tr. at 331-33, 367-69.) Physical findings revealed normal strength, with intact sensation and reflexes in all extremities. (Tr. at 332-33, 368-69.) Dr. Cheshire noted that Claimant had intact finger-nose-finger testing bilaterally and was able to walk well unassisted with normal stride and arm swing. (Tr. at 333, 369.) She assessed tingling, which possibly was consistent with CTS on the right. (Id.) Regarding the intermittent tingling in Claimant's feet, Dr. Cheshire noted that peripheral neuropathy was a possibility. (Id.) She ordered EMG and nerve conduction testing, which came back normal. (Tr. at 333, 346-51, 369.)

Claimant continued to see Dr. Morgan from March 5, 2013, through May 2, 2013, with similar complaints, findings, and diagnoses. (Tr. at 316-18.) On May 8, 2013, Claimant was evaluated by Dr. John Compton, M.D., for complaints of left wrist pain on referral from Dr. Morgan. (Tr. at 372-73.) Dr. Morgan wanted Dr. Compton to determine whether the plate in Claimant's wrist needed to be removed due to bilateral wrist pain and numbness in his fingers. (Tr. at 372.) Dr. Compton noted that Claimant neurovascularly was intact and that he had questionably positive Phalen's test and Tinel's sign over the bilateral wrists. (Tr. at 373.) The x-rays of Claimant's left wrist revealed a healed fracture of the distal radius and a nonunited ulnar styloid fracture. (Tr. at 371, 373.) Dr. Compton concluded that Claimant did not need to have any hardware removed. (Tr. at 373.)

On June 3, 2013, Dr. Morgan noted painful left wrist range of motion, right upper extremity pain with full extension and rotation to the right of the neck, diminished grip strength on the right, and low back pain with radiation to both legs with some numbness. (Tr. at 315.) Complaints and physical findings remained consistent on July 1 and 29, August 26, and September 24, 2013. (Tr. at 311-14.)

**Chest**:

The x-rays of Claimant's chest on September 24, 2011, revealed some haziness in the right lung with some infiltrate consolidation in the right middle lobe. (Tr. at 187, 219, 214-15, 282-83.) A follow-up chest x-ray and CT scan was recommended. (Id.) Dr. Morgan noted on physical exam on September 27, 2011, that Claimant's lungs were clear anteriorly and posteriorly with only a few scattered crackles. (Tr. at 196.) On October 26, 2011, Claimant reported a pulmonary problem with a lot of productive "dark material." (Tr. at 195.)

Claimant presented to Dr. Santpal S. Mavi, M.D., on November 2, 2011, for an abnormal chest x-ray. (Tr. at 168-70, 210-12, 251-53, 278-80.) Claimant reported increased shortness of breath, coughing, wheezing, and right sided chest pain. (Tr. at 169, 211, 252, 279.) Physical examination revealed normal respiratory movements, and a decrease in breath sounds. (Id.) Otherwise, physical exam was normal and straight leg raising testing in the supine and sitting positions was normal. (Id.) Chest x-rays revealed pulmonary hyperinflation consistent with chronic obstructive pulmonary disease ("COPD") and suggestion of subtle air space opacity in the right lung base medially. (Tr. at 171, 254.) Dr. Mavi diagnosed pneumonia, suspected COPD, and nicotine dependence. (Tr. at 169-70, 211-12.)

Pulmonary function testing on November 29, 2011, revealed an FEV1 of 3.11 liters, which was seventy percent of predicted. (Tr. at 172-78, 220, 255-61, 285.) The overall data was suggestive of a mild airflow obstruction without any bronchodilator response and mild decrease in diffusion capacity. (Tr. at 172, 220, 255.)

Chest x-rays on February 15, 2012, revealed no acute findings within the chest and findings that were stable compared to the x-rays on November 2, 2011. (Tr. at 231, 261, 281.) Chronic changes likely were related to COPD. (Id.) Claimant followed-up with Dr. Mavi on June 18, 2012. (Tr. at 353-55.) Claimant reported that he was doing well with his inhalers and indicated that he was

able to perform his daily activities. (Tr. at 354.) When Claimant mowed grass, he experienced shortness of breath and heart racing. (Id.) He indicated that his heart raced a lot, even on walking. (Id.) Physical exam was unremarkable and Dr. Mavi assessed COPD and discussed with Claimant the negative effects of tobacco use. (Tr. at 355.)

On July 11, 2012, Dr. Morgan noted that Claimant smoked one pack of cigarettes per day and diagnosed advanced COPD. (Tr. at 326.) He recommended that Claimant not smoke. (Id.) On August 9, 2012, he noted that Claimant's lungs were diminished, but clear. (Tr. at 325.)

**Opinions**:

On April 3, 2012, Dr. A. Rafael Gomez, M.D., a State agency reviewing medical consultant completed a form Physical RFC Assessment on which he opined that Claimant was capable of performing medium level work with occasional climbing ladders, ropes, or scaffolds and frequent climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. (Tr. at 295-302.) Dr. Gomez opined that Claimant should avoid concentrated exposure to vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 299.) He noted that Claimant was not fully credible and that his allegations were "out of proportion to the medical findings." (Tr. at 300.)

On October 8, 2013, Dr. Morgan completed a form Medical Assessment of Ability to Do Work-Related Activities (Physical), on which he opined that Claimant was capable of lifting five pounds occasionally and two pounds frequently; stand and walk two hours in an eight-hour workday for fifteen minutes at a time; and sit for three hours in an eight-hour workday for thirty minutes at a time without interruption. (Tr. at 342-43.) He further opined that Claimant could never climb, balance, stoop, crouch, kneel, or crawl, and should avoid environmental irritants. (Tr. at 343.) Dr. Morgan opined that Claimant's ability to reach and handle was affected and that he could do these functions, in addition to fingering and feeling on occasional bases only. (Tr. at 344.) Dr. Morgan opined that Claimant "will never work again." (Tr. at 345.)

12

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in analyzing Claimant's non-union of a fracture of his left upper extremity, lumbar spine impairment, and COPD, at step three of the sequential analysis. (Document No. 12 at 10-13.) In this regard, Claimant first asserts that the ALJ should have considered his upper extremity impairment under Listing 1.07 and not under Listing 1.02. (Id. at 10.) He next asserts that under Listing 1.04A, the ALJ improperly found that the evidence failed to demonstrate significant spinal stenosis, when the Listing did not require any specific degree of spinal stenosis. (Id. at 10-11.) Furthermore, Claimant asserts that the Listing does not require neurological loss, but does require nerve root compression. (Id. at 11.) He asserts that the lumbar spine MRI revealed both spinal stenosis and nerve root compression. (Id.) Furthermore, neuro-anatomic distribution of pain was evidenced by Dr. Morgan's examinations, which reflected positive straight leg raising and pain. (Id.)

Regarding Listing 3.02, Claimant asserts that the PFT results upon which the ALJ relied were performed two years prior to the hearing, and therefore, were stale. (Id.) Finally, Claimant contends that the ALJ failed to consider his impairments in combination with other impairments to determine whether they met or equaled a Listing level impairment. (Id. at 12-13.)

In response, the Commissioner asserts that although Claimant invokes Listing 1.04A, that Listing has no applicability because his lumbar MRI demonstrated mild disc bulging that abutted, not compressed, as Claimant asserts, the bilateral proximal S1 nerve root. (Document No. 13 at 16-20.) She notes that Dr. Werthammer interpreted the results to indicate only mild disc bulging, which neither warranted surgical intervention nor demonstrated significant stenosis. (Id. at 16-17.) The Commissioner therefore, asserts that Claimant failed to meet the threshold requirement of Listing 1.04A. (Id. at 17.) The Commissioner further asserts that the evidence failed to establish motor loss,

sensory and reflex loss, or atrophy, as required under Listing 1.04A. (Id.) Claimant takes issue with the manner in which the ALJ discussed neurological loss, but the Commissioner asserts that the term described things such as sensory or reflex loss. (Id.)

Respecting Listing 3.02, the Commissioner asserts that Claimant's PFT results clearly established that he failed to meet the Listing, and the evidence failed to meet the alternative clinical criteria. (Id. at 18.) Although Claimant complains that the ALJ should not have relied upon the PFT results, which were two years prior to the hearing date, the Commissioner contends that it was his burden to demonstrate that he met the Listing. (Id.) Moreover, the Commissioner notes that Claimant's attorney conceded at the hearing that his PFT test did not meet the Listing. (Id. at 18-19.)

Finally, the Commissioner asserts that Claimant is mistaken in alleging that the ALJ failed to consider the impairments in combination. (Id. at 19.) The Commissioner asserts that the ALJ considered all the evidence at step three of the sequential analysis and specifically noted that there neither was evidence from any treating or examining physician that he met a Listing level impairment, nor evidence of a combination of impairments equal in severity to a Listed impairment. (Id.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in giving no weight to the opinion of his treating physician, Dr. Morgan. (Document No. 12 at 13-15.) He asserts that the ALJ's stated reasons for having rejected Dr. Morgan's opinion were not "good reasons" as required by the Regulations and Rulings. (Id. at 14.) Claimant notes that Dr. Morgan's opinions were well supported by stated reasons and treatment notes. (Id.)

In response, the Commissioner asserts that the ALJ was not required to accept Dr. Morgan's "aberrant statements" when the other examination records from multiple treating specialists revealed essentially normal physical findings. (Document No. 13 at 11.) The Commissioner asserts that the

ALJ provided examples of specific deviations between Dr. Morgan's statements and the diagnostic and clinical evidence. (Id. at 12.) First, the ALJ noted that although Dr. Morgan reported severe COPD, pulmonary testing revealed only mild obstructive airway disease which responded well to inhalers. (Id.) Second, the ALJ explained that although Dr. Morgan noted limitations from cervical disc disease, the diagnostic tests did not support such statement. (Id.) Third, despite Claimant's allegations of debilitating lumbar pain and Dr. Morgan's finding of advanced DDD and spinal stenosis, the other medical evidence did not support such findings. (Id.) Specifically, the neurosurgeon noted that Claimant's DDD was only mild and that his stenosis was not severe. (Id.)

Fourth, the ALJ noted that the physical findings of the specialists were contradictory to Dr. Morgan's assertions. (Id. at 13.) Fifth, Dr. Morgan's extreme assertions conflicted with the opinion of Dr. Gomez. (Id.) Sixth, Dr. Morgan's assessments conflicted with the report from Dr. Wahi, who noted essentially normal physical findings. (Id. at 14.) Seventh, Dr. Morgan's statements were unsupported by Claimant's subjective limitations, as he acknowledged an ability to lift the weight Dr. Morgan ascribed, worked often with his hands, and walked as a means of transportation. (Id. at 15.) Consequently, the Commissioner contends that the ALJ was entitled to discount Dr. Morgan's "anomalous assertions" that conflicted with specialists' reports. (Id.) The Commissioner therefore asserts that the ALJ properly discredited Dr. Morgan's opinions. (Id.)

Analysis.

    1.  Listing Impairments.

Claimant first alleges that the ALJ erred in assessing his impairments at step three of the sequential analysis. (Document No. 12 at 10-13.) The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a)

(2013).

A. _Listing 1.04 – Spinal Disorders_:

Section 1.04 of the Listing of Impairments provides criteria for determining whether an individual is disabled by disorders of the spine. Such spinal disorders include, but are not limited to, a herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebra. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2014). The required level of severity for Listing § 1.04 is satisfied when the claimant has a disorder of the spine resulting in compromise of a nerve or the spinal cord with any one of the three following requirements:

> A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dyesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> OR
>
> C.   Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

In his decision, the ALJ concluded at step three of the sequential analysis that Claimant did not meet or equal a Listing level impairment under Listing 1.00. Although the ALJ did not reference Listing 1.04A specifically, his findings reflect the requirements of Listing 1.04A. For

16

instance, the ALJ found that the evidence did not demonstrate any neurological loss to the extremities or significant spinal stenosis. (Tr. at 22.) He also found that Dr. Werthammer opined that Claimant's MRI of the lumbar spine revealed no large disc herniations or areas of severe stenosis. (Id.) Furthermore, Claimant had a normal gait, motor strength, sensation, and deep tendon reflexes throughout. (Id.)

The evidence reveals that Claimant was diagnosed with disc bulging and degenerative change at L4-5 and L5-S1 that caused acquired central canal stenosis, without any significant neural foraminal narrowing. (Tr. at 22, 127.) Without considering the "degree" of stenosis required to meet the Listing, the undersigned finds that the evidence failed to establish any compression of the nerve root. The MRI scan on April 4, 2011, stated that the mild disc bulging at L5-S1 was "abutting the bilateral proximal S1 nerve root." (Tr. at 22, 127.) There is no indication that it actually compressed the nerve root. Moreover, although Claimant had abnormal straight leg raising testing, the evidence demonstrated normal motor strength, sensation, and reflexes. Accordingly, the undersigned finds that the ALJ's decision that Claimant's spinal condition did not meet or equal a Listing level impairment is supported by the substantial evidence of record.

B. *Listing 1.02 and 1.07 – Left Wrist Fracture*:

The required level of severity for Listing § 1.02 is satisfied when the claimant has a major dysfunction of a joint, characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion and findings on imaging of joint space narrowing, bony deconstruction, or ankyloses of the affected joint, with one of the following requirements:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b;

Or

17

>   B.  Involvement of one major peripheral joint in each upper extremity (i.e.,
>       shoulder, elbow, or wrist-hand), resulting in inability to perform fine and
>       gross movements effectively, as defined in 1.00B2c.

The ALJ concluded that Claimant did not meet Listing 1.02 because x-rays in May 2013, revealed a healed fracture of the distal radius; Dr. Wahi noted normal bilateral grip strength and range of wrist motion in August 2011; and Dr. Crompton noted intact function of all tendons going to each finger and thumb. (Tr. at 22, 144-45, 371-73.) The undersigned finds that the ALJ's analysis under Listing 1.02B, is supported by the substantial evidence.

Claimant contends however, that due to the x-ray findings of a non-united ulnar styloid fracture (Tr. at 371.), the ALJ should have considered his left wrist impairment under Listing 1.07, which is satisfied when there is a fracture of an upper extremity with non-union of a fracture of the shaft of the humerus, radius, or ulnar, "under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.07 (2014). Section 1.00M defines continued surgical management as "surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00M (2014). This section further indicates that such procedures or treatment may include post-surgical procedures, surgical complications, infections, or other medical complications that delay the attainment of maximum benefit from therapy. Id.

Under 1.07, the x-rays demonstrate a non-united ulnar styloid fracture. (Tr. at 371.) The issue therefore, is whether Claimant was under continued surgical management for the condition directed toward restoration. In view of the ALJ's failure to consider Claimant's left wrist

18

impairment under this Listing, the undersigned finds that the matter must be remanded for further consideration under Listing 1.07.

C. *Listing 3.02A – COPD*:

The required level of severity for Listing § 3.02A is satisfied when the claimant has COPD, due to any cause, with the FEV equal to or less than the values specified in the table corresponding the height. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A (2014). The ALJ noted in his decision that Claimant failed to meet the Listing because pulmonary function testing did not demonstrate the requisite diagnostic findings. (Tr. at 22.) In making this finding, the ALJ referred to the pulmonary function testing conducted by Dr. Mavi on November 29, 2011. (Tr. at 22, 174, 176.) Claimant testified at the hearing that he was 5'11" in height, which required him to have a FEV equal to or less than 1.55. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A. Dr. Mavi's testing revealed a GRV of 3.11. (Tr. at 174.) Although Claimant alleges that the pulmonary function testing was stale because it was conducted more than two years prior to the administrative hearing, the undersigned agrees with the Commissioner that it was Claimant's burden to demonstrate that he met a Listing level impairment. More compelling however, was Claimant's attorney's concession at the administrative hearing that Claimant's "pulmonary function test obviously isn't meeting the listing level." (Tr. at 394.) Accordingly, the undersigned finds that the ALJ's decision that Claimant's COPD did not meet or equal Listing 3.02, is supported by the substantial evidence of record.

2. Treating Opinion.

Claimant also alleges that the ALJ erred in discounting the opinions of his treating physician, Dr. Morgan. (Document No. 12 at 13-15.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d)

19

(2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2012). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more

20

weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2012). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2012). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2012). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In his decision, the ALJ assigned little weight to Dr. Morgan's opinion because his assessed limitations were excessive and unsupported by the entire evidence. (Tr. at 25.) The ALJ rejected Dr. Morgan's opinion that Claimant was disabled from all jobs because such an opinion regarded an issue reserved to the Commissioner. (Id.)

As the ALJ found, the evidence demonstrated that Claimant suffered from COPD, as confirmed by pulmonary functioning testing. Beyond Dr. Morgan's diagnosis however, the evidence suggested that Claimant's COPD only was mild in nature and responded to inhalers.

Likewise, despite Dr. Morgan's assessment of advanced DDD and spinal stenosis of the lumbar spine that required surgical intervention, Dr. Werthammer, a neurosurgeon, specifically found that Claimant condition did not require more than conservative treatment. Furthermore, Claimant acknowledged that he was able to lift 30 pounds, mowed grass, and walked as a means of transportation. Accordingly, the undersigned finds that the ALJ appropriately considered Dr. Morgan's opinion pursuant to the Regulations and that his decision to give Dr. Morgan's opinion little weight is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings for further consideration of Claimant's impairments at step three of the sequential analysis, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made,

and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Chief Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 9, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

23